**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kollasoft Incorporated, et al., | No. CV-19-05642-PHX-JZB |
| Plaintiffs, | **ORDER** |
| v. | |
| Kenneth T Cuccinelli, II, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction. (Doc. 20-1.) Specifically, Plaintiffs seek to "stay the legal effects" of Defendant U.S. Citizenship and Immigration Services's (USCIS or the Agency) denial of 27 unique H1B visa applications because those denials were based on illegal or ultra vires rules promulgated in a February 2018 policy memo issued by USCIS. (*Id.*) Defendant has filed a Response to Plaintiffs' Motion. (Doc. 30.)

On January 13, 2020, the Court held oral argument between the parties on the Motion. (Doc. 31.) Because Plaintiffs' Motion fails to demonstrate a substantial likelihood of success on the merits or irreparable harm, the Court will deny the Motion.

**I.  Background.**

    **a.  Parties.**

Plaintiffs are a collection of 11 information technology (IT) consulting companies that employ workers on visas under 8 U.S.C. § 1101(a)(15)(H)(i)(b) (H1-B Visas). Each

Plaintiff has a similar business plan: "[e]ach Plaintiff employer hires highly educated IT workers, petitions for H1B visas for them, and places them off site at an end-client to perform IT work." (Doc. 20-1 at 2.) Plaintiffs maintain that each Plaintiff employer "hires, fires, pays, reviews and controls where each employee is placed" and "[m]ost importantly . . . signs the labor condition application ('LCA') that the Department of Labor [r]equires for all H1B Employers." (*Id.*) Each Plaintiff employer also files the H1B visa application on behalf of their employee. (*Id.*)

Defendant Mark Koumans is the Acting Director of USCIS, and is in charge of all adjudications and processing for visas or status under 8 U.S.C. § 1101(a)(15)(H).

### b. H1B Visa Program.

H1B visas are available to United States employers for "specialty occupations." 8 U.S.C. § 1184(g). Congress allocates 85,000 H1B Visas per fiscal year. 8 U.S.C. § 1184(g)(1)(A)(vii). In recent years, because demand for cap subject H1B Visas has exceeded the supply, the Agency runs a lottery six months prior to the beginning of the fiscal year.

### c. February 22, 2018 USCIS Policy Memo.

On February 22, 2018, the Agency issued a new memo entitled: "Contracts and Itineraries Requirements for H-1B Petitions involving Third-Party Worksites" (the "2018 Memo"). (Doc. 20-2 at 1-7.) In the "Background" section of the 2018 Memo, the Agency included the following summary of prior agency memos and their guidance that is superseded by the 2018 Memo:

> (1) On June 6, 1995, the Office of Adjudications issued a memorandum entitled "Contracts Involving H-1B Petitions" (Contracts Memo).
>
> This memo stated that the former Immigration and Naturalization Service (INS) may request and consider any additional information deemed appropriate to adjudicate a petition. The memo required INS to make such requests, which include requests for third-party contracts, on a case-by-case basis. This [Policy Memorandum] PM supersedes the Contracts Memo to the extent that it is contrary to this PM.
>
> (2) On November 13, 1995, the Office of Examinations issued a memorandum entitled "Supporting Documentation for H-1B Petitions" (H-1B Supporting Documents Memo).

> This memo stated that "[t]he submission of . . . contracts [between the employer and the alien worksite] should not be a normal requirement for the approval of an H-1B petition filed by an employment contractor. Requests for contracts should be made only in those cases where the officer can articulate a specific need for such documentation. The mere fact that a petitioner is an employment contractor is not a reason to request such contracts." It appears that this memo has been interpreted as generally excusing the H-1B petitioner from having to submit third-party contracts despite the director's specific regulatory authorization to require any such evidence that he or she believes is necessary for adjudicating the petition. *See* 8 CFR 214.2(h)(9)(i). This PM supersedes the H-1B Supporting Documents Memo to the extent that it is contrary to this PM.
>
> (3) On December 29, 1995, the Office of Adjudications issued a memorandum entitled "Interpretation Of The Term 'Itinerary' Found in 8 CFR 214.2(h)(2)(i)(B) As It Relates To The H-1B Nonimmigrant Classification" (Itinerary Memo).
>
> This memo stated that, in the case of an H-1B petition filed by an employment contractor, INS could accept a general statement of the alien's proposed or possible employment, since the regulation does not require that the employer provide the *exact* dates and places of employment. Because the Itinerary Memo allows general statements in certain instances instead of exact dates and places of employment, some adjudicators and the public may have incorrectly interpreted the policy as excusing the petitioner from having to submit an itinerary when required under 8 CFR 214.2(h)(2)(i)(B). USCIS now rescinds the Itinerary Memo and this PM will supersede any guidance from that memo.
>
> (4) On January 8, 2010, USCIS issued a memorandum entitled "Determining the Employer- Employee Relationship for Adjudication of H-1B Petitions, Including Third-Party Site Placements" (Employer-Employee Memo).
>
> The Employer-Employee Memo provides guidance on the requirement that a petitioner establish that an employer-employee relationship exists and will continue to exist with the beneficiary throughout the duration of the requested H-1B validity period. When a beneficiary is placed into another employer's business, the petitioner must establish that it continues to maintain an employer-employee relationship with the beneficiary. USCIS looks at a number of factors to determine whether a valid relationship exists, including whether the petitioner controls when, where, and how the beneficiary performs the job. Finally, the Employer-Employee Memo clarifies that the petitioner must submit an itinerary in compliance with current regulation at 8 CFR 214.2(h)(2)(i)(B), if the beneficiary will be performing services in more than one location. *See also Matter of Simeio Solutions, LLC*, 26 I&N Dec. 542, 548 n.9 (AAO 2015).

(Doc. 20-2 at 1-2.) The 2018 Memo includes the following observations regarding third-party business models and the goals of the Agency associated with those models:

> USCIS acknowledges that third-party arrangements may be a legitimate and frequently used business model. These arrangements typically involve a third-party end-client who solicits service providers to deliver a product or fill a position at their worksite. In some cases, the H-1B petitioner may place the beneficiary directly with the client, establishing a *petitioner-client* relationship. In other cases, one or more subcontractors, commonly referred to as vendors, may serve as intermediaries between the end-client and the H-1B petitioner. Ultimately, through a series of legal agreements, the petitioner will provide the H-1B worker to the end-client through a *petitioner-vendor(s)-client* relationship. Scenarios involving a third-party worksite generally make it more difficult to assess whether the petitioner has established that the beneficiary will actually be employed in a specialty occupation or that the requisite employer-employee relationship will exist. The difficulty of this assessment is increased in situations where there are one or more intermediary vendors and where the relationship between the petitioner and the end-client is more attenuated than a direct *petitioner-client* relationship.
>
> Based on the agency's experience in administering the H-1B program, USCIS recognizes that significant employer violations—such as paying less than the required wage, benching employees (not paying workers the required wage while they wait for projects or work) and having employees perform non-specialty occupation jobs—may be more likely to occur when petitioners place employees at third-party worksites. Therefore, in order to protect the wages and working conditions of both U.S. and H-1B nonimmigrant workers and prevent fraud or abuse, USCIS policy should ensure that officers properly interpret and apply the statutory and regulatory requirements that apply to H-1B petitions involving third-party worksites.

(*Id.* at 3-4.) In light of the Agency's outlined goals regarding third-party business models, the 2018 Memo purports to "provide[] clarifying guidance regarding the contracts and itineraries that petitioners submit in third-party worksite cases[.]" (*Id.* at 4.) Specifically, the 2018 Memo states that:

> When a beneficiary will be placed at one or more third-party worksites, the petitioner must demonstrate that it has specific and non-speculative qualifying assignments in a specialty occupation for the beneficiary for the entire time requested on the petition. The petitioner will need to show that:
>
> - The petitioner has a specific work assignment in place for the beneficiary;
>
> - The petition is properly supported by a Labor Condition Application (LCA) that corresponds to such work; and
>
> - The actual work to be performed by the H-1B beneficiary will be in a specialty occupation based on the work requirements imposed by the end-client who uses the beneficiary's services. *See Defensor v. Meissner*, 201 F.3d 384, 387 (5th Cir. 2000).
>
> USCIS notes that H-1B petitions do not establish a worker's eligibility for H-1B classification if they are based on speculative employment or do not

> establish the actual work the H-1B beneficiary will perform at the third-party worksite. Petitioners who regularly place their workers at third-party worksites often submit uncorroborated statements describing the role the H-1B beneficiary will perform at the third-party worksite. Such statements by the petitioner, without additional corroborating evidence, are often insufficient to establish by a preponderance of the evidence that the H-1B beneficiary will actually perform specialty occupation work.
>
> For such third-party, off-site arrangements, additional corroborating evidence, such as contracts and work orders, may substantiate a petitioner's claim of actual work in a specialty occupation. In all instances, the petitioner's burden of proof is to establish that the H-1B beneficiary will be employed in a specialty occupation and that the petition is properly supported by an LCA that corresponds to the actual work the beneficiary will perform. If the petitioner does not submit corroborating evidence or otherwise demonstrate that there is a specific work assignment for the H-1B beneficiary, USCIS may deny the petition.

(*Id.*) The 2018 Memo includes a non-exhaustive list of evidence that a petitioner may provide to demonstrate that a beneficiary has "actual work assignment(s) in specialty occupation[,]" including "[e]vidence of actual work assignments," "[c]opies of relevant signed contractual agreements between the petitioner and all other companies involved in the beneficiary's placement," "[c]opies of detailed statements of work or work orders signed by an authorized official of the ultimate end-client company where the work will actually be performed by the beneficiary," or "[a] letter signed by an authorized official of each ultimate end-client company where the beneficiary will actually work." (*See* Doc. 20-2 at 5.)

The 2018 Memo also clarifies the Agency's position as to the requirements of an itinerary submitted alongside petitions for work placements where services are to be performed at more than one location. (Doc. 20-2 at 6.) Specifically, it states:

> The itinerary must include the dates and locations of the services to be provided. The prior Itinerary Memo's allowance of general statements, as opposed to exact dates and places of employment, seems to have been incorrectly interpreted by some adjudicators, and some members of the general public, as excusing the petitioner from having to submit an itinerary, as required by 8 CFR 214.2(h)(2)(i)(B).
>
> There is no exemption from this regulatory requirement. An itinerary with the dates and locations of the services to be provided must be included in all petitions that require services to be performed in more than one location, such as multiple third-party worksites. The itinerary should detail when and where the beneficiary will be performing services. Adjudicators may deny the petition if the petitioner fails to provide an itinerary, either with the initial petition or in response to a Request for Evidence.

(*Id.*) The 2018 Memo goes on to provide that "[a]lthough the regulations only require that an itinerary contain the dates and locations of the services to be provided when the petition requires the beneficiary to work at multiple worksites, a more detailed itinerary can help to demonstrate that the petitioner has non-speculative employment, even when the beneficiary will only be working at one third-party worksite." (*Id.*)

> For instance, it could help USCIS determine whether there are specific and non-speculative qualifying assignments if the petitioner submits a complete itinerary of services or engagements that specifies:
>
> - The dates of each service or engagement;
> - The names and addresses of the ultimate employer(s);
> - The names, addresses (including floor, suite, and office) and telephone numbers of the locations where the services will be performed for the period of time requested; and
> - Corroborating evidence for all of the above.

(*Id.*)

On the final page of the 2018 Memo, the Agency stresses that the only intended use for the document is guidance:

> This memorandum is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

(*Id.* at 7.)

### d. Alleged Effect of 2018 Memo.

Plaintiffs allege that the changes outlined in the 2018 Memo's Background section, taken alongside the directives contained in the remainder of the document, establish two new rules that are binding on Agency adjudicators: (1) the "Specific Work Assignment" rule, and (2) the "Actual Control Rule." (Doc. 20-1 at 3-4.) And, according to Plaintiffs, since the Agency's publishing of the 2018 Memo, "H1B Visa denial rates have skyrocketed." (*Id.* at 3.) Specifically, Plaintiffs contend:

> USCIS reported the approval rates for the top ten H1B filers in FY

> 2018. H1B Stats (attached as [Doc. 21-3]). Out of the top ten H-1B filers, seven of these companies are IT consulting companies while three petitioners use onsite workers only. The three companies that petition for onsite workers only have a 99% approval rate; the remaining seven have overall approval rates from 68% to 83%. The denials rates for the top three on this chart for extensions of previously approved work are, respectively: 29%, 17.4%, 26%, 23.4%, 25.5%, 17.2%, and 14.5%. When USCIS started applying its new substantive rules, applications that had been previously approved got denied at inordinate percentages.

(*Id.*) Plaintiffs also assert that USCIS has denied 27 petitions put forth by Plaintiffs in this action, solely on the basis of the two new substantive rules announced in the 2018 Memo. (*Id.* (citing Docs. 20-4, 20-5).)

### e. Procedural History.

On November 18, 2019, Plaintiffs initiated this action by filing their Complaint in this Court. (Doc. 1.) On December 9, 2019, Plaintiffs filed their First Amended Complaint. (Doc. 14.) On December 17, 2019, Plaintiffs filed their Motion for Preliminary Injunction, seeking a court order to "stay the legal effects of these [27] denials pending judicial review." (Doc. 21-1 at 17.)

On January 9, 2020, the Agency filed its Response. (Doc. 30.) On January 13, 2020, the Court held oral argument between the parties on the Motion. (Doc. 31.)

## II. Legal Standard.

### a. Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). A "plaintiff [must] make a showing on all four prongs" to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (stating that a plaintiff "must show" all four factors before an injunction may issue (citation and internal quotation marks omitted)). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction by showing "serious questions go[ ] to the merits" of its

claims and a balance of hardships that tips "sharply" towards the plaintiff, so long as it makes a showing on the other two factors. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (citing *Alliance*, 632 F.3d at 1135).

    **b.**    **Prohibitory versus Mandatory Injunction.**

A preliminary injunction can take two forms – a prohibitory or a mandatory injunction. A "prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (citation omitted). In contrast, a "mandatory injunction orders a responsible party to take action . . . [,] goes well beyond simply maintaining the status quo pendente lite[,] and is particularly disfavored." *Id.* at 879 (citations omitted). Thus, a mandatory injunction is "subject to a higher degree of scrutiny . . . ." *Stanley v. Univ. of So. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted). Indeed, the Ninth Circuit has warned courts to be "extremely cautious" when issuing this type of relief, *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984), and requests for such relief are generally denied "unless extreme or very serious damage will result," and even then, not in "doubtful cases." *Marlyn Nutraceuticals,* 571 F.3d at 879. *See also LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1158 (9th Cir. 2006); *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). In such cases, district courts should deny preliminary relief unless the facts and law *clearly favor* the moving party. *Google*, 786 F.3d at 740.

Here, because Plaintiffs seek the Court to order Defendants to affirmatively take an action, i.e., to change the status of the H1B applications at issue from denied to pending, Plaintiffs are seeking a mandatory injunction. Accordingly, the Court will apply the heightened scrutiny associated with such a request.

**III.**    **Discussion.**

    **a.**    **Likely to Succeed on the Merits.**

The Court must first examine whether Plaintiffs are likely to succeed on the merits of their claim. In this instance, Plaintiffs claim that Defendant's denial of the 27 unique

H1B petitions put forth by Plaintiffs is unlawful because the bases for those denials are two illegal rules promulgated in the Agency's 2018 Memo. (Docs. 14, 20-1.) Specifically, Plaintiffs argue that the rules are illegal because either (1) they are substantive rules that did not go through the required notice and comment period, or (2) to the extent they are not substantive rules, they are *ultra vires*. (Doc. 20-1 at 4-18.)

### 1. Legal Standard.

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside agency action" promulgated "without the observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA requires that agencies advise the public through a notice in the Federal Register of the terms or substance of a proposed legislative rule and allow the public a period of time to comment. *Erringer v. Thompson*, 371 F.3d 625, 629 (2004). "This is termed the notice-and-comment requirement of the APA." *Id.*; *see* 5 U.S.C. § 553(b), (c); *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) ("An agency can issue a legislative rule only by using the notice and comment procedure described in the APA, unless it publishes a specific finding of good cause documenting why such procedures 'are impracticable, unnecessary, or contrary to the public interest.'").

The APA's notice-and-comment requirement for legislative rules grants interested persons, organizations, and entities "an opportunity to participate in the rulemaking process" by submitting written data, opposing views, or arguments. *Erringer*, 371 F.3d at 629 (*quoting Chief Prob. Officers of California v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997)); 5 U.S.C. § 553(c). This procedural gate holds government agencies accountable and ensures that these agencies issue reasoned decisions. *Bullock v. Internal Revenue Serv.*, 401 F. Supp. 3d 1144, 1156 (D. Mont. 2019) (citing *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 758 (9th Cir. 1992)). "In contrast, an agency need not follow the notice and comment procedure to issue an interpretive rule." *Hemp Indus. Ass'n*, 333 F.3d at 1087.

Whether an agency rule is interpretive or legislative is a question of law for the Court. *Id.* at 1086. Interpretive rules are "issued by an agency to advise the public of the

agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (internal quotation marks omitted). These rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Industries*, 333 F.3d at 1087. "Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Id.*

The Ninth Circuit has provided guidance for courts evaluating whether a rule has the "force of law and is therefore legislative":

> (1) when in the absence of the rule, there would not be an adequate legislative basis for enforcement action;
>
> (2) when the agency has explicitly invoked its general legislative authority; or
>
> (3) when the rule effectively amends a prior legislative rule.

*Id.* (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)).

The Ninth Circuit has also provided guidance for determining whether an agency's purported "general statement of policy," in actuality, constitutes a new legislative rule. "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Sacora v. Thomas*, 628 F.3d 1059, 1069-70 (9th Cir. 2010) *quoting Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). "To qualify as a general statement of policy . . . a directive must not establish a binding norm and must leave agency officials free to consider the individual facts in the various cases that arise and to exercise discretion." *See Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 512-13 (9th Cir. 2018), *cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 139 S. Ct. 2779 (2019)).

### 2. Discussion.

Here, Plaintiffs argue that the 2018 Memo promulgated two new substantive rules,

and that those rules have been improperly enacted by the agency without the requisite notice and comment period required under the APA. (Doc. 20-1 at 5-8.) Specifically, Plaintiffs argue (1) "there is no adequate legislative basis for enforcing these rules absent the policy memo" (*id.* at 6); (2) "the Agency expressly invoked its general legislative authority as a basis for these rules" (*id.* at 6-7); and (3) "both rules effectively amend prior legislative rules" (*id.* at 7-8).

As an initial matter, the 2018 Memo, on its face, does not specifically enumerate either a "Special Work Assignment Rule" or an "Actual Control Rule." (*See* Doc. 20-2.) Both terms have been coined by Plaintiffs as a way of identifying the new guidance they view as unlawfully substantive.

Second, the Court is not persuaded by Plaintiffs' blanket assertion that "there is no adequate legal basis for enforcing these rules absent the policy memo." (Doc. 20-1 at 6.) Congress has provided the Secretary of the Department of Homeland Security ("DHS") with broad discretion to determine the terms and conditions for admitting nonimmigrants. 8 U.S.C. § 1184 (a)(1) (The "admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General [now Secretary of DHS] may by regulations prescribe."); (c)(1) ( the "question of importing any alien as a nonimmigrant . . . in any specific case or specific cases shall be determined by the Attorney General [now USCIS] . . ."). And under 8 C.F.R. § 214.2(h)(9)(i), the Agency director is mandated to "consider all the evidence submitted and such other evidence as he or she may independently require to assist his or her adjudication." If, as the Agency suggests in its response, evidence of specific work assignments is required to properly evaluate the validity of an employer-employee relationship (doc. 30 at 10), then this regulation may arguably serve as an adequate basis for a majority of the 2018 Memo's directives.

And to the extent Plaintiffs argue that any regulation requiring petitioners to provide specific work assignments for the entire expected term of the H1B visa "would violate[] 8 U.S.C. § 1182 (n)(2)(C)(vii)" (doc. 20-1 at 6), the Court disagrees. Section 1182 (n)(2)(C)(vii) – which prevents H1B employers from placing H1B employees in an unpaid,

nonproductive status – serves to prevent employers from stopping payment to employees in the event that the employer has been forced to place the employee in nonproductive status. It does not prohibit the Agency from, at the time a petition is submitted, expecting the petitioner/H1B employer to anticipate the beneficiary/H1B employee will maintain an active status throughout the term of the visa. *See* 8 C.F.R. § 214.2(h)(9)(ii)(A) and (iii).

Furthermore, Plaintiffs' contention that the Agency "expressly invoked its general legislative authority as a basis for these rules" (doc. 20-1 at 6) is unsupported by the record. To be sure, the 2018 Memo lists "Section 214 of the INA and Title 8, Code of Federal Regulations (CFR), section 214.2(h)" under the heading "Authority," but that single boilerplate statement is not dispositive of the Agency's intention to promulgate new legislative rules. Indeed, "Section 214 of the INA and [8 C.F.R. § 214.2(h)]" constitute the *entirety* of authority the Agency has over regulating H1B visas, not just the authority that permits the Agency to enact legislative rules.

Lastly, Plaintiff's contention that "both rules effectively amend prior legislative rules" (doc. 20-1 at 7) is unpersuasive. While the 2018 Memo does identify a number of prior policy memorandums that are superseded by this latest guidance; it does not go so far as to "amend a prior legislative rule." (*See id.*); (doc. 20-2 at 2-7.)[1] The general statements of policy contained in the 2018 Memo do not deprive the Agency and its implementing officials of their "free[dom] to consider the individual facts in the various cases that arise and to exercise discretion." *See Regents of the Univ. of California*, 908 F.3d at 512-13.

Ultimately, the Court finds it an open question whether the directives contained in the 2018 Memo constitute substantive rules necessitating a notice-and-comment period. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) ("A preliminary injunction, of course, is not a preliminary adjudication on the merits[.]"). However, at this stage, the Court cannot find that Plaintiffs are "likely to succeed on the

---

[1] The Court is mindful that it need not afford deference to the Agency's characterization of the 2018 Memo's guidance as non-substantive. *See Hemp Industries*, 333 F.3d at 1087 ("While the [agency] has characterized its rule as an interpretive rule, the court need not accept the agency characterization at face value.") *citing Gunderson v. Hood*, 268 F.3d 1149, 1154 n.27 (9th Cir. 2001) ("The label an agency attaches to its pronouncement is not clearly dispositive.").

merits[,]" *Winter*, 555 U.S. at 20, and that the facts and law *clearly favor* Plaintiffs' claim, *Google*, 786 F.3d at 740, such that a mandatory injunction is proper in this case.

### b. Irreparable Harm.

Because Plaintiffs have not met their burden on the first factor, the Court need not consider the remaining three factors. *See Beloozerova v. Dignity Health*, No. CV-18-01976-PHX-DGC, 2018 WL 3660043, at *6 n.2 (D. Ariz. Aug. 2, 2018); *RCM Technologies, Inc. v. U.S. Dept. of Homeland Sec.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("A 'conclusion that [plaintiffs are] not likely to succeed on the merits effectively decides the preliminary injunction issue.'") (quoting *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998)). However, the Court will briefly address the parties' arguments as to irreparable harm.

In the context of preliminary injunctive relief, the plaintiff bears the burden of showing that he is likely to suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 20. Here, Plaintiffs argue that they will suffer irreparable harm absent court intervention for three reasons: (1) "Plaintiffs pays more than $4,000 per petition, and it cannot recoup those lost fees" (doc. 20-1 at 16); (2) "Plaintiffs will also lose lost revenue for the clients' contracts they cannot serve, and the damage to the good will from the interruptions in service" (*id.*); and (3) "Plaintiffs will lose the benefit of getting their applications selected in the FY 2019 H1B Visa Lottery" (*id.*).

Plaintiffs' first reason does not constitute irreparable harm. Generally, "[s]imple monetary harm does not constitute an immediate threat of irreparable harm." *Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cty. Washington*, 783 Fed. App'x 769, 770-71 (9th Cir. 2019) *citing L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). One exception is when the financial harm poses a legitimate threat to the existence of the company seeking an injunction. *See id.*; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). Additionally, some courts have found that irreparable harm may be shown through unrecoverable monetary harm where the

plaintiff(s) are suing a government entity that has not waived sovereign immunity to seek monetary damages. *See North Dakota v. U.S. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015); *See also Baker Elec. Coop.*, 28 F.3d at 1473 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984)), *Leadbetter v. Rose*, 467 N.W.2d 431, 432 (N.D. 1991)).

Here, Plaintiffs fail to introduce any evidence that an inability to recover their petition fees would drive them out of business or cause them to suffer harm beyond monetary damages. To the extent Plaintiffs contend that their petition fees are unrecoverable because the United States has not waived sovereign immunity for Plaintiffs to seek monetary relief in APA cases, Plaintiffs' argument is unfounded. At oral argument the Agency represented that petition fees would be returned to Plaintiffs for any petitions that were not granted an H1B visa. Thus, in this instance, Plaintiffs' inability to recover monetary damages in an APA case is inapplicable, because the only source of potential financial harm Plaintiffs identify, the petition fees, will be returned by the Agency absent Plaintiffs' desired result. Accordingly, Plaintiffs' first reason does not constitute irreparable harm.

Plaintiffs' second and third reasons also fail because they are speculative. "To support injunctive relief, harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough." *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 Fed. App'x. 676, 679 (9th Cir. 2011). Rather, "'a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.'" *Id.* (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).

Plaintiffs present insufficient evidence, in the context of this motion, to support their assertion that they will be unable to complete contracts or will suffer interruptions in service of their clients. The beneficiaries of Plaintiffs H1B petitions described in this action are not current employees of Plaintiffs. They are not currently working or completing contracts for Plaintiffs. They are a potential future workforce. Nothing is preventing

Plaintiffs from hiring other employees to prevent unfulfilled contracts or interruptions in service to their clients while this litigation process resolves. Accordingly, at this juncture, Plaintiffs' alleged harm of lost revenue from breached contracts and damage to good will does not constitute irreparable harm. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674.

Additionally, Plaintiffs have presented no evidence that they will "lose the benefit of getting their applications selected in the FY 2019 H1B Visa Lottery." (Doc. 20-1 at 16.) In contrast, at oral argument, the Agency represented to the Court that two of Plaintiffs' challenged petitions had already been reclassified as pending, and that three other petitions were expected to similarly be reclassified soon. That Plaintiff is obtaining such relief without Court intervention further establishes that there is no imminent harm, or immediate threat of injury, that would justify imposition of a mandatory injunction. *See Amylin Pharm., Inc.*, 456 Fed. App'x. at 679.

**IV. Conclusion.**

In sum, because Plaintiffs have failed to demonstrate likely success on the merits or irreparable harm absent court action, the Court will deny Plaintiffs' Motion for Preliminary Injunction. (Doc. 20-1.)

Dated this 17th day of January, 2020.

Honorable John Z. Boyle
United States Magistrate Judge